IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Angel V. Jackson,<br><br>                     Plaintiff,<br><br>    vs.<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security,<br><br>                  Defendant. | Civil Action No. 6:15-2789-DCN-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

       This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on May 15, 2006, alleging she became unable to work on April 1, 2006. The Title XVI claim was denied upon initial review for excess resources. The DIB application was denied initially and on reconsideration by the Social Security Administration. A hearing was held before an administrative law judge

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

("ALJ") and on April 21, 2009, the ALJ found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  No further action was taken.

On October 22, 2009, the plaintiff filed a second DIB application alleging disability beginning April 1, 2006.  The claim was denied initially and upon reconsideration, and the plaintiff requested a hearing.  On June 20, 2011, an ALJ dismissed the claim because the plaintiff withdrew her request for a hearing.

The plaintiff filed her current applications for DIB and SSI benefits on July 20, 2011, alleging that she became unable to work on June 20, 2011.  The applications were denied initially and on reconsideration by the Social Security Administration.  On April 2, 2012, the plaintiff requested a hearing.  The ALJ, before whom the plaintiff and G. Roy Sumpter, an impartial vocational expert, appeared on August 27, 2013, considered the case *de novo*, and on February 14, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on May 22, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.
>
> (2)    The claimant has not engaged in substantial gainful activity since June 20, 2011, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: headaches, thyroid disorder (Graves' disease and Hashimoto encephalitis with ataxia, hand tremor, double vision), osteoarthritis involving hands, left knee, hip, and back, chronic obstructive pulmonary disease, and obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  In consideration of AR 00-1(4) and *Albright v. Commissioner of the Social Security*

2

*Administration*, this finding has changed from the prior decision for the reasons detailed below.

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except never climb ropes/ladders/scaffolds and occasionally climb steps/ramps, balance, stoop, kneel, crouch or crawl. She can handle and finger frequently and must avoid concentrated exposure to hazards and fumes. Due to visual disturbance, she cannot drive or handle small objects such as a needle. In consideration of AR 00-1(4) and *Albright v. Commissioner of the Social Security Administration*, this finding has changed from the prior decision.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)     The claimant was born on June 28, 1964, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from June 20, 2011, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually

4

performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4ᵗʰ Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4ᵗʰ Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4ᵗʰ Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the

5

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 46 years old on the alleged disability onset date (June 20, 2011) and 49 years old on the date of the ALJ's decision (February 14, 2014).  She completed two years of college and has past relevant work experience as a nursery school attendant/ daycare worker (Tr. 79, 95-96).

On February 21, 2011, the plaintiff was treated by Dr. Raul Cruz who noted during an office visit with respect to the plaintiff's asthma with chronic obstructive pulmonary disease ("COPD") that the plaintiff "has severe obstruction and restriction with an FEV1 <1 liter. "This may qualify her for disability since she also has symptoms of shortness of breath with minimal exertion" (Tr. 498).  Dr. Cruz noted that the plaintiff was five feet two inches (5'2'') tall and weighed 250 pounds (Tr. 497)..

On October 11, 2011, the plaintiff sought treatment at St. Luke's Free Medical Clinic in Spartanburg, South Carolina, based on complaints of headaches and loss of balance for the last month (Tr. 614).  A CT scan showed partial opacification of the paranasal sinuses.  The plaintiff returned to the clinic on October 25, 2011, with continued complaints of headaches, inability to drive, double vision, and "trouble thinking."  The clinic referred the plaintiff to a neurologist (Tr. 613).

On November 4, 2011, the plaintiff saw neurologist Carol A. Kooistra, M.D., based on her one-month history of hand tremors with difficulty balancing, left shoulder pain, and blurred vision, which was intermittent.  She also complained of head pain occurring with her other symptoms that lasted one hour and for which she took ibuprofen.  The plaintiff had intact cranial nerves, normal muscle strength, normal fine motor movements, intact sensation, normal reflexes, and a negative Romberg's test.  She had no weakness on heel or toe walking, but mildly impaired tandem walking.  Dr. Kooistra diagnosed the plaintiff with

6

diplopia, headaches, and gait abnormality (Tr. 598). Dr. Kooistra ordered a brain MRI, metabolic testing, and an ophthalmology exam (Tr. 599).

When the plaintiff returned to Dr. Kooistra on December 21, 2011, the plaintiff reported that she still experienced headaches. Her brain MRI and eye examination were normal. The plaintiff had mild anemia, but her glucose levels were normal. An examination revealed normal muscle strength, fine motor movements, gait, and reflexes. Dr. Kooistra ordered thyroid testing as she believed it could be the cause of the plaintiff's headaches (Tr. 600).

On February 27, 2012, the plaintiff complained of episodic bilateral leg weakness and continued headaches. The plaintiff's thyroid was "still off," but she had not received any treatment for it yet. The plaintiff had normal muscle strength, fine motor movements, gait (including tandem gait), and reflexes. Dr. Kooistra stated that many of the plaintiff's symptoms, including headaches, diplopia, and muscle weakness, may be linked to the plaintiff's thyroid disease, and treatment for thyroid disease was important (Tr. 670).

On July 9, 2012, the plaintiff returned to Dr. Kooistra after her thyroid disease stabilized with medication. The plaintiff reported "crazy" headaches occurring "more than once" since they began in May 2012. The plaintiff also complained of "severe abrupt onset posterior pain" with the headaches. She noted her "walking was off again." Dr. Kooistra noted that there may have been some mild flattening of the right side of the plaintiff's face, but that her cranial nerves were intact and no ataxia or reflex change was detected. She ordered another MRI to rule out Arnold–Chiari Malformation ("ACM") (Tr. 668).

On August 1, 2012, the plaintiff reported that her symptoms persisted. The MRI of her brain was normal. The plaintiff generally had normal muscle strength, fine motor movements, gait (including tandem gait), and reflexes. Dr. Kooistra noted that the plaintiff's symptoms were "somewhat atypical," but she did not "see any other disease process" and proceeded with treatment for May-Hegglin Anomaly ("MHA"). Dr. Kooistra medically cleared the plaintiff to travel to New York and prescribed Topamax (Tr. 666).

On October 4, 2012, the plaintiff reported trouble with cognitive functions, such as spelling the name of her street incorrectly and difficulty "getting her words out." The plaintiff generally had normal muscle strength, fine motor movements, gait (including tandem gait), and reflexes (Tr. 664).

On November 28, 2012, the plaintiff reported that her "crazy" headaches and memory impairment persisted. The plaintiff generally had normal muscle strength, fine motor movements, gait (including tandem gait), and reflexes. Dr. Kooistra prescribed prednisone (Tr. 693).

On January 23, 2013, the plaintiff reported that her headaches were "significantly improved" and specifically less frequent – only occurring two times per week—and less severe since taking prednisone. The plaintiff tolerated the prednisone with no side effects. The plaintiff generally had normal muscle strength, fine motor movements, gait (including tandem gait), and reflexes. Dr. Kooistra noted that she wanted to attempt an initial prednisone taper and then eventually a further taper to a slower rate based on the plaintiff's response (Tr. 691).

On March 28, 2013, the plaintiff reported reducing her prednisone dosage and having only one headache since her last visit. The plaintiff stated that her prescribed medications "allow[ed] her to function better around the home." The plaintiff generally had normal muscle strength, fine motor movements, gait (including tandem gait), and reflexes. Dr. Kooistra continued the plaintiff's prednisone taper with a plan to discontinue it completely in eight weeks (Tr. 689).

On May 23, 2013, Dr. Kooistra stated that the plaintiff appeared to be "doing well" overall. The plaintiff reported that her headaches were "doing well" despite the prednisone taper. The plaintiff mentioned some continued memory issues (Tr. 829). Dr. Kooistra noted that the plaintiff was independent in her activities of daily living, driving a car, and handling her finances. The plaintiff generally had normal muscle strength, fine motor movements, gait (including tandem gait), and reflexes (Tr. 829).

On August 14, 2013, Dr. Kooistra completed a form headache residual functional capacity ("RFC") questionnaire at the plaintiff's counsel's request (Tr. 841-45). Dr. Koositra stated that the plaintiff had daily hemicranial headaches that were severe, especially at night (Tr. 841).  The headaches were accompanied by mental confusion. Dr. Kooistra stated that the plaintiff had experienced headaches for 18 months and that prednisone made the plaintiff's headaches better but caused weight gain (Tr. 842). She indicated that the plaintiff would be precluded from performing even basic work activities and needed a break from the work place during the time when the plaintiff had a headache (Tr. 843).  She stated that the plaintiff would need to take daily one-hour breaks where she needed to lie down or sit quietly (Tr. 844).  Dr. Kooistra also checked an answer indicating that the plaintiff would likely be absent from work about four times a month due to her headaches or treatment (Tr. 844).

On May 2, 2014, approximately three months after the ALJ issued his decision, Dr. Kooistra offered a second statement at the request of the plaintiff's counsel, which was submitted to the Appeals Council. The Appeals Council denied the request for review (Tr. 1) and made the evidence part of the record (Tr. 4; *see* Tr. 847). Dr. Kooistra stated that the plaintiff's headache frequency had fluctuated over time and that the plaintiff reported a varying number of headaches from one headache in between visits (as of March 2013) to nearly nightly hypnic headaches, in part dependent on her prednisone dosage. Dr. Kooistra noted that as of her last visit on February 5, 2014, the plaintiff reported a four-week history of mild, frontal nightly headaches (Tr. 847).

At the time of the hearing before the ALJ, the plaintiff was unemployed and living with her elderly parents. She had not worked since 2006.  The plaintiff testified that her employment ended after she was unable to perform her job due to continuous illness and bronchitis.  Her asthma made her more susceptible than most to illnesses, and, as a substitute teacher, she was constantly exposed to illness.  As a result, the plaintiff was phased out of her job and was not contacted for further substitute jobs by the School District (Tr. 80, 262).

9

The plaintiff testified that her most debilitating impairment was headaches that began in October 2011.  She stated that the headaches usually occur one to two or more times per week and usually last one to two hours.  The plaintiff also stated that the frequency of the headaches was in concurrence with her taking of Prednisone and Topomax (Tr. 81-82).  The plaintiff testified that the headaches are accompanied by ataxia and double vision.  She stated the double vision has affected her ability to drive, particularly at night.  The plaintiff testified that although the headaches have improved since she has been taking the Prednisone and Topomax that she still cannot drive at night (Tr. 83).

When questioned about her memory loss at the ALJ hearing, the plaintiff testified that it is something "very simple, like a simple Bible scripture, you know, everybody knows the Bible scripture, I'm sitting there and I know it, and I can't remember" (Tr. 85).

During the relevant period, the plaintiff read, used the computer (i.e., e-mail, computer games, and video chat), watched television, cooked simple meals once or twice a week, washed dishes, did laundry, swept, took out the trash, dusted, cleaned the bathroom, sat on her deck, went to church every Sunday, visited her cousin, shopped for groceries, and drove a car (Tr. 87-91, 93).  In May 2013, the plaintiff traveled on a bus to Florida from South Carolina to attend a women's conference, although she reported missing some of the conference due to headaches (Tr. 90).

At the hearing, the ALJ asked the vocational expert whether a hypothetical individual of the plaintiff's age, education, past work experience, and RFC could perform any work that exists in significant numbers in the national and regional economy (Tr. 96-97).  In response, the vocational expert testified that such an individual could perform the representational light, unskilled jobs of a storage facility rental clerk, final inspector (with the numbers reduced in half to account for the plaintiff's visual restrictions), and a cashier II (Tr. 97).  On cross-examination, the vocational expert indicated that if the plaintiff's medical condition required her to miss two to four days per month, there likely was no work in significant numbers in the national economy she could perform.  The vocational expert stated that there were no jobs available for an individual of the plaintiff's same age,

10

education, and experience with the aforementioned limitations recommended by Dr. Kooistra (Tr. 99).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1)  assigning only "little weight" to the opinion of her treating neurologist, Dr. Kooistra; (2) failing to properly assess her credibility; and (3)  failing to provide a proper hypothetical to the vocational expert.  The plaintiff also argues that the Appeals Council improperly failed to consider new and material evidence submitted by Dr. Kooistra.

### Treating Physician

The plaintiff first argues that the ALJ erred in the evaluation of the opinion of her treating neurologist, Dr. Kooistra.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight

given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As more fully set forth above, on August 14, 2013, Dr. Kooistra completed a form headache RFC questionnaire opining that the plaintiff had daily hemicranial headaches that were severe, especially at night, and were accompanied by mental confusion. Dr. Kooistra stated that prednisone made the plaintiff's headaches better but caused weight gain, and the plaintiff would be precluded from performing even basic work activities and needed a break from the work place during the time when she had a headache.  She stated that the plaintiff would need to take daily, one-hour breaks where she needed to lie down or sit quietly and would likely be absent from work about four times a month due to her headaches or treatment (Tr. 841-45).

The plaintiff argues that this opinion should have been given controlling weight (pl. brief at 12-18).  The ALJ considered Dr. Kooistra's opinion[2] and found that it was not

---

[2] The ALJ also considered Dr. Kooistra's opinion given on November 4, 2011, when she first examined the plaintiff.  At that time, Dr. Kooistra stated that the plaintiff had developed recent physical difficulties that affected her ability to stand and walk for periods of time.  Dr. Kooistra opined that the plaintiff would need accommodations that would require walking less than two blocks and standing for less than 30 minutes at a time (Tr. 696).  The ALJ found the opinion was not entitled to controlling weight as Dr. Kooistra failed to provide any medical rationale to support the standing/walking restrictions (Tr. 31).  As the ALJ noted (Tr. 31), Dr. Kooistra's examination findings from the same date were normal, other than mildly impaired tandem walk (Tr. 598).  The plaintiff apparently does not take issue with the ALJ's assessment of this opinion.

entitled to controlling weight because it was not adequately supported by clinical findings or other substantial and credible evidence of record (Tr. 31). Specifically, the ALJ determined that Dr. Kooistra's statements as to the frequency and severity of the plaintiff's headaches were inconsistent with and unsupported by the treatment records as a whole that showed that medication effectively controlled the plaintiff's headaches and significantly reduced their frequency and severity (Tr. 32). As argued by the Commissioner, the plaintiff's statement that her headaches did not improve disregards Dr. Kooistra's contemporaneous findings documented in her treatment records from November 2011 through May 2013 (pl. brief at 15; Tr. 26-29, 31-32). The ALJ acknowledged that the plaintiff began treatment for headaches, which lasted for only one hour and for which she took ibuprofen, in November 2011 (Tr. 27, 32; *see* Tr. 598), and her symptoms continued in December 2011 and February 2012, even though the plaintiff denied having headaches to her gynecologist in February 2012 (Tr. 27, 32; *see* Tr. 600, 670). The plaintiff argues that the ALJ misidentified the February 2, 2012, record from her gynecologist as a record of Dr. Kooistra and then incorrectly used it to show that Dr. Kooistra's treatment records did not support her opinion (pl. brief at 13). The ALJ did not misidentify the treatment note (Tr. 27, 32). The ALJ accurately identified the record as a treatment note from the plaintiff's gynecologist and used this record as an example of an inconsistent statement made by the plaintiff about her headaches to different treatment provides in February 2012 (Tr. 27). The ALJ also used the February 2, 2012, record in which the plaintiff denied having headaches to support his conclusion that Dr. Kooistra's opinion was inconsistent with the treatment records as a whole (Tr. 31-32).

The ALJ also acknowledged that the severity of the plaintiff's headaches increased and that she reported "crazy" headaches occurring "more than once" from May 2012 until November 2012, when she began taking prednisone (Tr. 27, 32; *see* Tr. 666, 668). The ALJ explained that the plaintiff's headaches significantly improved, in terms of

frequency and severity, since the initiation of prednisone and that the plaintiff continued to improve despite the tapering of her prednisone dosage from January through May 2013 (Tr. 28-29, 32; *see* Tr. 689, 691, 829). As the ALJ noted, in May 2013, Dr. Kooistra stated that the plaintiff was "doing well" and was independent with activities of daily living, driving a car, and handling her finances (Tr. 28-29, 32; *see* Tr. 829).

The plaintiff also contends the ALJ relied on an "erroneous finding that Dr. Kooistra's treatment notes reveal that she traveled to New York," which the ALJ found undermined Dr. Kooistra's opinion of disability (pl. brief at 14). The undersigned finds no error. The ALJ reasonably pointed out that Dr. Kooistra's opinion that the plaintiff suffered from daily debilitating headaches was inconsistent with the doctor's action of medically clearing the plaintiff to travel from South Carolina to New York in August 2012 (at a time when the plaintiff claimed to suffer from "crazy" headaches) (Tr. 27, 32, *see* Tr. 666). Whether or not the plaintiff actually traveled to New York was not the issue[3]; the ALJ relied on the inconsistency between Dr. Kooistra's opinion that the plaintiff experienced debilitating headaches and Dr. Kooistra's statement regard the plaintiff's medical "ability" to travel from South Carolina to New York (Tr. 32; *see* Tr. 666). The ALJ also noted that the plaintiff was able to travel to Florida to attend a conference (Tr. 29, 32; *see* Tr. 90), which was inconsistent with daily debilitating headaches.

The plaintiff further argues that the ALJ improperly discounted Dr. Kooistra's opinion that the plaintiff required daily, unscheduled, one-hour work breaks and would miss four days of work per month based on his lay opinion (pl. brief at 16-17). As discussed above, the ALJ properly discounted Dr. Kooistra's opinion because it was inconsistent with and unsupported by the treatment records. The record shows that, with treatment, the

---

[3]In an affidavit submitted to the Appeals Council, the plaintiff attests that while she asked Dr. Kooistra about whether she could travel to New York, and Dr. Kooistra said it was ok, she never traveled to New York following the office visit (Tr. 364).

plaintiff's headaches decreased in severity, duration, and frequency. As the ALJ noted, Dr. Kooistra's own notes showed that the plaintiff's headaches typically occur at night (Tr. 32; *see* Tr. 841). Dr. Kooistra further stated that "during times" when the plaintiff had a headache, she "would need a break from the workplace" (Tr. 843). As the ALJ reasonably found, the plaintiff's night time headaches would not plausibly necessitate daily, unscheduled, one-hour work breaks, as opined by Dr. Kooistra (Tr. 32; *see* Tr. 844).

Based upon the foregoing, the ALJ reasonably concluded that the restrictions that Dr. Kooistra placed on the plaintiff were not supported by the record, including Dr. Kooistra's own treatment notes and the treatment records of other providers.

In the alternative, the plaintiff argues that she should at least be entitled to a closed period of disability from September 2011, when her headaches first began, to January 2013, when Dr. Kooistra instituted the Prednisone taper and her headaches significantly improved (pl. brief at 16 (citing Tr. 614, 693)). It is undisputed that the plaintiff suffered from headaches, and the ALJ found that the plaintiff's headaches were a severe impairment (Tr. 20). The plaintiff's argument that "the fact [she] was having two headaches per week in January 2013 is still disabling" (pl. brief at 15 (emphasis in original)), is incorrect. The plaintiff does not and cannot establish that her headaches ever reached a disabling level of severity. *See* 20 C.F.R. §§ 404.1509, 416.909; *Walton v. Barnhart*, 535 U.S. 212, 225 (2002) (durational requirement requires that impairment remain at a disabling level of severity for twelve continuous months). Likewise, even assuming that her headaches reached a disabling level at some point, the plaintiff cannot show that they remained at a disabling level for twelve continuous months. *Id*. Specifically, although the plaintiff's headaches began in September 2011, her headaches were not debilitating at that time. Rather, she described them as lasting only one hour, during which she took ibuprofen (Tr. 598). The plaintiff acknowledged that the severity of her headaches increased between September 2011 and May 2012 at which time she began to have "crazy" headaches

15

occurring more than once (Tr. 668). Then, less than twelve months later, in January 2013, the plaintiff reported that her headaches were significantly improved – less frequent and less severe – with medication (Tr. 691). Through the date of the ALJ's decision, the plaintiff's headaches continued to be controlled by medication (Tr. 689, 829). At her last examination that was approximately nine days before the ALJ issued his decision, the plaintiff's was having mild, nightly headaches (Tr. 847). Accordingly, substantial evidence supports the ALJ's evaluation of Dr. Kooistra's opinion and finding that the plaintiff's headaches were not debilitating.

### *Appeals Council Evidence*

The plaintiff further argues that the Appeals Council improperly failed to consider new and material evidence from Dr. Kooistra (pl. brief at 18-21).   As noted above, in a letter dated May 2, 2014, Dr. Kooistra stated that the plaintiff's headache frequency had fluctuated over time and that the plaintiff reported a varying number of headaches from one headache in between visits (as of March 2013) to nearly nightly hypnic headaches, in part dependent on her prednisone dosage.   Dr. Kooistra noted that as of her last visit on February 5, 2014, the plaintiff reported a four-week history of mild, frontal nightly headaches (Tr. 847). The Appeals Council denied the request for review (Tr. 1).  The Appeals Council found that the new evidence did not provide a basis for changing the ALJ's decision and made the evidence part of the record (Tr. 2, 4; see Tr. 847).

The law provides that evidence submitted to the Appeals Council with the request for review must be considered in deciding whether to grant review " 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.' " *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir.1991) (en banc) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir.1990)). Evidence is new "if it is not duplicative or cumulative." *Id*. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.*

The United States Court of Appeals for the Fourth Circuit has explicitly held that "[t]he Appeals Council need not explain its reasoning when denying review of an ALJ decision." *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir.2011). The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence and reached through the application of the correct legal standard. *Id*. at 704. "In making this determination, we 'review the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" *Id.* (quoting *Wilkins*, 953 F.2d at 96).

The ALJ in *Meyer* issued a decision denying benefits and noted therein that Meyer failed to provide an opinion from his treating physician. *Id.* at 702. When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician that detailed Meyer's injuries (from a fall) and significant physical restrictions. The Appeals Council summarily denied review but made the letter part of the administrative record. The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician, and thus the report should be accorded only minimal weight. The district court adopted the Report and Recommendation. *Id*. at 704. The Court of Appeals, however, determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the report filled an "evidentiary gap" emphasized by the ALJ. *Id*. at 707. The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had considered, noting that the treating physician's opinion corroborated the opinion of an evaluating physician, which had been rejected by the ALJ, but other record evidence credited by the ALJ conflicted with the new evidence. *Id.* The court concluded: "Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record.

17

Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance." *Id.*

The plaintiff's argument that remand is required for consideration of Dr. Kooistra's May 2014 letter fails.   As argued by the Commissioner, the plaintiff's significant improvement and the effectiveness of her treatment is bolstered – and not undermined – by Dr. Kooistra's subsequent opinion submitted to the Appeals Council for the first time after the ALJ issued his decision. Dr. Kooistra's statement that the plaintiff's headache frequency fluctuated between her visits between March 2013 and February 2014, ranging from one headache in between visits to nearly nightly, mild headaches (Tr. 847) reveals that the plaintiff's headaches were either mild (and thus less severe) and occurring nightly (and thus outside the hours of a normal workday), or only occurred once during the average two to three month period between visits (thus less frequent). Dr. Kooistra's subsequent opinion did not include any additional functional limitations not already included in her initial opinion given in August 2013( *compare* Tr. 841-45 *with* Tr. 847).  Unlike *Meyer,* Dr. Kooistra's May 2014 opinion does not fill an evidentiary gap and does not impact the ALJ's assessment of Dr. Kooistra's August 2013 opinion.

The plaintiff argues that this is *post hoc* rationale that was not articulated by the ALJ or the Appeals Council for rejecting Dr. Kooistra's later opinion (pl. reply at 6-7). The undersigned disagrees.   The Appeals Council was not required to articulate its rational for denying the request for review of the ALJ's decision. *Meyer*, 662 F.3d at 702. The court has reviewed the new evidence and agrees with the Commissioner that it does not provide a basis for changing the ALJ's decision; specifically, Dr. Kooistra's May 2014 opinion does not fill an evidentiary gap nor does it include any additional functional limitations not already considered by the ALJ in his assessment of Dr. Kooistra's earlier opinion. *See Fulton v. Colvin*, C.A. No. 4:14-2625-RBH, 2015 WL 5008761, at *4 (D.S.C. Aug. 19, 2015) ("The opinion of Dr. Ellis did not fill "an evidentiary gap that played a role in (the ALJ's) decision.")

18

(citing *Meyer*, 662 F.3d 700)); *Kramitz v. Colvin*, C.A. No. 6:11-2037-CMC-KFM, 2013 WL 681898, at *4 (D.S.C. Feb. 22, 2013) ("Unlike *Meyer*, Plaintiff's new evidence does not fill an evidentiary gap that the ALJ determined was lacking.").   After reviewing the record as a whole, including the evidence submitted to the ALJ, the undersigned finds that the ALJ's decision is supported by substantial evidence and reached through the application of the correct legal standard.   Accordingly, this allegation of error is without merit.

### *Credibility*

The plaintiff contends that the ALJ's assessment of her credibility is not based upon substantial evidence (pl. brief at 21-23).   The undersigned disagrees.  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.   First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original).  In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006).  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or

sensory or motor disruption), if available should be obtained and considered.'" *Id*. at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's

20

credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ followed the appropriate two-step process in evaluating the plaintiff's credibility (Tr. 25-32).  The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 25).  The plaintiff contends that the ALJ erred in discrediting

21

her allegations regarding her headaches in substantial part based on the lack of objective medical evidence (pl. brief at 22). The undersigned finds no error. *See Johnson*, 434 F.3d at 658; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); SSR 96-7p, 1996 WL 374186, at *6 (absence of objective medical evidence supporting an individual's statements is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence).

The ALJ explained that the plaintiff's alleged limitations resulting from headaches were not supported by the medical evidence and, in particular, the plaintiff's treatment history (Tr. 26-27). 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ began his credibility analysis by thoroughly discussing all the medical evidence relating to the plaintiff's headaches (Tr. 27-28). In doing so, the ALJ acknowledged the plaintiff's normal neurological and physical examinations, MRI and CT scans of the brain, and laboratory testing results (Tr. 27-28). Then, the ALJ explained that the plaintiff's allegations about the "severity, frequency, and duration" of her headaches were inconsistent with and unsupported by her treatment and her response thereto as contemporaneously documented in treatment records of her neurologist and endocrinologist (Tr. 29). Citing to several treatment records in 2012 and 2013, the ALJ made clear that the plaintiff contemporaneously complained of headaches of lesser severity and duration and that routine treatment, with medication, significantly improved and reduced the severity, frequency, and duration of the plaintiff's headaches (Tr. 29; *see* Tr. 689, 691, 829).

In accordance with the Commissioner's regulations, the ALJ also reasonably relied on the plaintiff's significant level of activities of daily living (Tr. 28-29). 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); *see O'Kelley v. Colvin*, C.A. No. 12-2553-JMC, 2014 WL 468994, at *3 (D.S.C. Feb. 5, 2014) (explaining that an ALJ properly considers a plaintiff's daily activities when assessing credibility and RFC). As explained by the ALJ, the plaintiff spent her day performing a variety of activities, such as reading, using the computer (i.e.,

22

e-mail, computer games, and video chat), watching television, cooking simple meals (once or twice a week), washing dishes, doing laundry, sweeping, taking out the trash, dusting, cleaning the bathroom, sitting on her deck, going to church every Sunday, visiting her cousin, shopping for groceries, caring for her parents, and driving a car (Tr. 28-29; *see* Tr. 87-91, 93, 269-70). The ALJ also explained that the plaintiff remained capable of traveling as she traveled to Florida by bus to attend a women's conference in May 2013 (Tr. 29; *see* Tr. 90, 666). In addition, the ALJ relied upon Dr. Kooistra's statement in her May 2013 treatment note that the plaintiff was independent in her activities of daily living and drove a car (Tr. 29; *see* Tr. 829).

The ALJ also reasonably discounted the plaintiff's credibility based on other inconsistencies between her subjective statements and evidence in the record (Tr. 29). 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). For example, among other inconsistencies, the ALJ pointed out that "[a]lthough Plaintiff attribute[d] her inability to work to chronic headaches and thyroid problems beginning in 2011, this is her third application for disability and she has not worked since 2006 after she was laid off from her job as a nursery school attendant (Tr. 29; *see* Tr. 262). The ALJ further noted (Tr. 29) that while the plaintiff testified that she was unable to grasp a curling iron (Tr. 85), neurological records from January 2013 showed that the plaintiff had normal fine motor movements (Tr. 691), which undermined her credibility.

Based upon the foregoing, the undersigned finds that the ALJ adequately explained his credibility finding, and it is supported by substantial evidence.

### Hypothetical

The plaintiff argues that the ALJ failed to provide a proper hypothetical to the vocational expert (pl. brief at 24-26). Specifically, the plaintiff asserts that the hypothetical question failed to account for her missing approximately four days of work per month as

23

suggested by Dr. Kooistra and failed to include a restriction for limited exposure to light and noise (pl. brief 24-25). This argument also fails.

Having carefully reviewed and weighed the medical evidence of record, the ALJ put forth a comprehensive hypothetical question, which mirrored the RFC assessment, to the vocational expert that fairly set forth all of the plaintiff's credibly established limitations (Tr. 96-97). The plaintiff's argument relies on his argument discussed above that the ALJ did not properly formulate his RFC. For the reasons stated above, the plaintiff has failed to demonstrate that the ALJ's determination concerning the RFC finding is unsupported by substantial evidence. Therefore, this argument also fails. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir.2005) (noting that "the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*") (emphasis in original); *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments.") (internal citations omitted).

The vocational expert's response, indicating that a person with the plaintiff's vocational background and described limitations would be able to perform representative jobs that exist in significant numbers in the national and regional economy, constitutes substantial evidence in support of the ALJ's determination (Tr. 33-34, 97-98).

The ALJ was under no obligation to include limitations to account for the plaintiff's purported absenteeism and sensitivity to light and noise. As discussed above, substantial evidence supports the ALJ's decision to afford little weight to Dr. Kooistra's opinion. Therefore, the ALJ was not required to include Dr. Kooistra's finding regarding the plaintiff's absences in the hypothetical question. *See Craig*, 76 F.3d at 593-94. Similarly, the ALJ was not obligated to include a restriction to limited exposure to light and noise because it too was not a credibly established limitation. The plaintiff has failed to cite any

24

objective medical findings or medical opinions supporting such a limitation. Notably, in Dr. Kooistra's opinions on which the plaintiff heavily relies, Dr. Kooistra declined to indicate that bright lights or noise either triggered or made the plaintiff's headaches worse (Tr. 842, 847). Accordingly, the hypothetical question on the whole was supported by substantial evidence.

### CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 29, 2016
Greenville, South Carolina